## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**AVA STREET-UGBESIA and DAVID CARTER** individually, and on behalf of others similarly situated,

Case No.:

Plaintiffs,

Hon.:
Magistrate Judge:

vs.

**DELOITTE CONSULTING LLP**, a Delaware limited liability partnership**,**

Defendant.

---

## COLLECTIVE AND CLASS ACTION
## COMPLAINT AND JURY DEMAND

Plaintiffs, AVA STREET-UGBESIA and DAVID CARTER ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Class/Collective Action Complaint against Defendant DELOITTE CONSULING LLP ("Deloitte or "Defendant"), and state as follows:

## INTRODUCTION

1. This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 and arising from Defendant's willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, the Illinois Minimum Wage Law ("IMWL"), § 820 ILCS 105/1, *et seq.*, the Illinois Wage Payment and Collection Act ("IWPCA"), § 820 ILCS 115/1, *et seq.*, and for common law unjust enrichment.

2. At all relevant times, Defendant contracted with the state of Illinois to perform various functions for its citizens. For example, Defendant contracted with the State of Illinois to assist with unemployment claims made through the Illinois Department of Employment Services

1

("IDES") and also for Covid-19 tracing through the Illinois Department of Public Health ("IDPH").

3.      In order to fulfill its contractual duties to the State of Illinois, Defendant required hourly customer service employees to communicate with Illinois citizens. Defendant contracted with third party vendors (staffing agencies) to provide them with these hourly customer service employees. However, despite being obtained through a staffing agency, at all relevant times, Defendant exercised control over nearly all relevant aspects of these hourly employees including training, performance of job duties, schedules, and attendance.

4.      These hourly customer service employees have a variety of internal job titles, but are collectively referred to herein as customer service representatives ("CSRs").

5.      One such vendor or staffing agency for these CSRs was PCG International, Inc., doing business as PCG Consulting Group (hereinafter "PCG"). This lawsuit targets only CSRs obtained by Defendant through PCG.[1]

6.      At all relevant times, and as explained herein, Defendant was a joint employer of the CSRs with PCG.

7.      The U.S. Department of Labor ("DOL") recognizes that call center jobs, like those held by Defendant's CSRs, are homogenous, and in July 2008, the DOL issued Fact Sheet #64 to alert call center employees to some of the abuses which are prevalent in the industry.  *See* DOL Fact Sheet #64: Call Centers under the Fair Labor Standards Act (FLSA), https://www.dol.gov/whd/regs/compliance/whdfs64.pdf.

8.      One of those abuses, present in this case, is the employer's refusal to pay for work "from the beginning of the first principal activity of the workday to the end of the last principal

---

[1] PCG is already named as a Defendant in another lawsuit for the wage and hour violations alleged herein. *See*, *Carter, et al. v. PCG International, Inc.*, Case No. 22-cv-04504 (N.D. Ill.).

activity of the workday." *Id*. at p. 2.

9.      More specifically, DOL Fact Sheet #64 condemns an employer's non-payment of an employee's necessary pre-shift activities: "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications and work-related emails." *Id.* Additionally, the FLSA requires that "[a] daily or weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities, must be kept." *Id*.

10.      Defendant, together with PCG, requires its CSRs to work a full-time schedule, plus overtime, however, Defendant does not compensate CSRs for all work performed.

11.      Defendant, together with PCG, requires their CSRs to perform compensable work tasks off-the-clock before and after their scheduled shifts and during their unpaid meal periods.

12.      This policy results in CSRs not being paid for all time worked, including overtime.

13.       In the course of performing their job responsibilities, Defendant's CSRs use multiple computer networks, software programs, applications and phone systems.

14.      The time CSRs spend booting up and logging into these programs and applications before, during and after their shifts is compensable because the programs and applications are an integral, indispensable and important part of the CSRs' work, and they cannot perform their jobs effectively without them.

15.      Defendant's CSRs all perform essentially the same tasks and are required to use the same or similar computer programs, software programs, applications and phone systems.

16.      Upon information and belief, Defendant's CSRs all follow the same timekeeping process and are subject to the same relevant timekeeping and attendance policies.

17.      Plaintiffs seek to represent in this action all current and former CSRs who were

obtained by Defendant through PCG and are similarly situated to each other in terms of their positions, job duties, pay structure and Defendant's violations of federal and state law.

18. Defendant knew or should have known how long it takes CSRs to complete their off-the-clock work, and Defendant could have properly compensated Plaintiffs and the putative Collective and Class for this work, but did not.

19. Defendant (as a joint employer) knew or should have known that CSRs, including Plaintiffs, worked overtime hours for which they were not compensated.

20. In addition to the off-the-clock computer bootup and shutdown processes, Defendant (as a joint employer) and PCG implemented a policy and practice of compensating CSRs based on their talk/phone time, rather than the time they spent clocked into Defendant's timekeeping system.

21. Further, Defendant (as a joint employer) otherwise failed to pay CSRs for all hours worked as evidenced by Plaintiffs' timekeeping records, which show they were clocked in and working for longer than Defendant paid them for.

22. Additionally, Defendant (as a joint employer) failed to provide CSRs with bona fide lunch periods, and failed to compensate CSRs for meal periods that were less than thirty minutes in duration.

23. Additionally, Defendant (as a joint employer) failed to include non-discretionary bonuses paid in the calculation of the CSRs' regular hourly rate in overtime workweeks.

24. Additionally, at the onset of the relevant class period, Defendant (as a joint employer) misclassified CSRs as independent contractors and paid them no overtime whatsoever in workweeks that the CSRs exceed forty hours per week.

25. Plaintiffs seek a declaration that their rights, and the rights of the putative Collective

and Class, were violated, an award of unpaid wages, an award of liquidated damages, injunctive and declaratory relief, attendant penalties and an award of attorneys' fees and costs to make them, the Collective and Class whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendant to such illegal conduct in the future.

## JURISDICTION

26.     This Court has subject matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under 29 U.S.C. § 201, *et seq.*

27.     Additionally, this Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

28.     Moreover, this Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).

29.     This is a class action in which the aggregate claims of the individual Class members exceed the sum value of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 Class members, and at least some members of the proposed class have a different citizenship than Defendant.

30.      Defendant's annual sales exceed $500,000 and Defendant has more than two employees, so the FLSA applies in this case on an enterprise basis.

31.     Defendant's CSRs, including Plaintiffs, engage in interstate commerce or in the production of goods for commerce and therefore they are also covered by the FLSA on an individual basis, by virtue of their regular and routine use of phone lines in the performance of their job duties.

32.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant

to 28 U.S.C. § 1367 because they are so closely related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

33. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

34. This Court has personal jurisdiction over Deloitte because it conducts business within the state of Illinois, has a place of business in Illinois, is registered with the Illinois Secretary of State and employs individuals within the state of Illinois.

35. This Court also has personal jurisdiction over Defendant because it has purposefully availed itself of the privilege of conducting activities in the state of Illinois, has established minimum contacts sufficient to confer jurisdiction over it and has its principal place of business in this district and division; and the assumption of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process. Moreover, Plaintiffs' injuries arise out of Deloitte's business activities within this District.

## VENUE

36. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is licensed to do business in this district and transacts business in this district, and is subject to personal jurisdiction in this district.

## PARTIES

37. Plaintiff AVA STREET-UGBESIA ("Plaintiff Street") is an Illinois resident who worked for Defendant as a remote CSR in Illinois within the last three years.

38. Defendant, as a joint employer, and through PCG, paid Plaintiff Street for her services in the form of an hourly wage, for all credited hours worked, most recently at the rate of

$17.85 per hour.

39.     Plaintiff Street signed a consent to join this collective action lawsuit. See **Exhibit 1**.

40.     Plaintiff DAVID CARTER ("Plaintiff Carter") is an Illinois resident who worked for Defendant as a remote CSR in Illinois within the last three years.

41.     Defendant, as a joint employer, and through PCG, paid Plaintiff Carter for his services in the form of an hourly wage, for all credited hours worked, most recently at the rate of $16.64 per hour.

42.     Plaintiff Carter signed a consent to join this collective action lawsuit. See **Exhibit 2**.

43.     Defendant Deloitte is a company organized and existing under the laws of Delaware and licensed to do business in the State of Illinois, with a registered agent of Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and a principal office at 30 Rockefeller Plaza, New York, NY 10112, and a Chicago office at 111 South Wacker Drive, Chicago, Illinois 60606.

44.     At all times relevant, Defendant had the power to hire and fire the joint employees of PCG.

45.     At all times relevant, Defendant supervised and controlled employee work schedules and/or conditions of employment, of the employees of PCG, and specifically controlled and dictated the policies at issue in this case.

46.     At all times relevant, Defendant created, implemented, assented to, or enforced the unlawful policies and practices discussed herein, including: misclassifying CSRs as independent contractors; failing to pay them for all hours worked; failing to pay overtime premiums as required

by state and federal labor laws; and failing to include non-discretionary bonus payments in the calculation of their overtime rates.

47.     At all times relevant, Defendant and PCG jointly determined or had input regarding the rate and method of payment for employees of PCG.

48.     At all times relevant, Defendant and PCG both maintained employment records regarding the employees of PCG.

## GENERAL ALLEGATIONS

49.      Defendant jointly employed Plaintiffs as remote CSRs from Plaintiffs' home offices in Illinois within the last three (3) years.

50.     At the onset of the employment relationship, Defendant and PCG reached an agreement with Plaintiffs to compensate them for all hours worked at a specified hourly rate.

51.     This employment agreement is evidenced by a writing, signed by Plaintiffs and Defendant, which sets forth the terms of employment and the agreed upon hourly rate for the performance of a CSRs job duties. *See*, **Exhibit 3, David Carter Offer Letter**.

52.     While Defendant does not appear on the written offer letter, Defendant is a joint employer, and thus, likewise responsible for the payment of the promised wages to Plaintiff.

53.     Defendant's CSRs are responsible for, among other things: (a) booting up their computers and logging into several essential computer software programs and applications, as well as a phone system, before fielding phone calls; (b) taking in-bound calls from and making out-bound calls to individuals who need assistance with unemployment benefits; (c) ensuring that every call is documented and accounted for; and (d) logging out of the computer software programs and applications and the hard phones and shutting down their computers.

54.     Defendant's CSR jobs are hourly, non-exempt positions with rigid schedules that

8

require CSRs, including Plaintiffs, to work at least eight (8) hours per day, on average five (5) days each week, and up to forty (40) hours or more in a workweek.

55.     These schedules result in CSRs routinely working overtime on a weekly basis.

56.     Indeed, throughout their employment with Defendant, Plaintiffs were required to work a substantial amount of unpaid time, including overtime, as part of their roles as a CSR.

57.     At the onset of the applicable class period, from approximately January 2020 to 2021, Defendant, together with PCG, misclassified Plaintiffs and all other CSRs as independent contractors. The economic reality of the parties' relationship was that the CSRs were employees, not independent contractors.

58.     At all relevant times, Defendant, together with PCG, controlled the CSRs' work schedules, duties, protocols, applications, assignments and employment conditions.

59.     Defendant, together with PCG, was also responsible for training and continuing the CSRs' education in their role as CSRs.

60.     In the performance of their job duties, CSRs utilized computers provided to them by Defendant and PCG.

61.     Defendant's CSRs all perform essentially the same tasks and are required to use the same or similar computer programs, software programs, applications and phone systems.

62.     These programs, applications and systems are integral and an important part of the CSRs' work, and they cannot perform their jobs without them. Defendant and PCG provide the CSRs with the computers, access to all of the necessary programs and applications, and the training to use the programs.

63.     Defendant's CSRs all follow the same timekeeping processes, are subject to the same relevant timekeeping and attendance policies, and are subject to quality assurance reviews

9

based on the same or similar criteria.

64.     Defendant, together with PCG, instructs and trains CSRs to have all of their computer networks, software programs and applications open and ready at the start of their scheduled shifts and before they can log into the phone system and begin taking and making phone calls.

65.     CSRs, including Plaintiffs, are instructed not to clock in until they are fully prepared to field calls.

66.     In fact, Defendant and PCG implemented a policy of only compensating Plaintiffs and other CSRs for the time they are available to receive/make calls in their phone system (Finesse).

67.     Specifically, the timekeeping policy of Defendant and PCG states that CSRs will be paid "as indicated by talk/phone time and statusing in Finesse." Further, only items deemed "billable" by Defendant's client (State of Illinois) will be paid upon during the payroll period.

68.     Despite only paying Plaintiffs and other CSRs for the talk/phone time, CSRs were still required to clock-into the timekeeping system.

69.     Notably, a comparison of timekeeping records with the pay records will establish that Plaintiffs and other CSRs were significantly underpaid by Defendant.

70.     Defendant retained the ill-gotten gains from underpaying CSRs and used the monies to finance its business activities.

71.     To the extent Defendant and PCG eventually started compensating CSRs based on their clock-in time, Defendant still required CSRs to be "call ready" before clocking in. The process of being call ready requires CSRs to engage in substantial off-the-clock work loading and logging into computer systems.

72.     Defendant furthermore enforces its policy of requiring all computer networks, programs and applications be open and ready at the commencement of a CSRs' shift, and critically, before the clock in, through performance metrics.

73.     More specifically, being clocked in but unavailable to take calls for too long can result in poor performance scores and possible disciplinary action, up to and including termination.

74.     Defendant and PCG's scoring guidelines measure a CSRs' ability to adhere to mandatory protocols and are comprised of various performance metrics, including but not limited to the CSRs' complete and correct resolution of issues and inquiries.

75.     This performance metric necessarily requires that CSRs be logged into all computer programs, applications and systems, and have all reference materials and available resources open at the time of the call.

76.     Furthermore, Defendant and PCG promise CSRs non-discretionary bonuses for meeting specified attendance, schedule adherence, and call quality evaluation scores.

77.     In one example, Defendant issued a flyer to PCG to explain its "IDES Virtual Call Center Agent Bonus Program" designed to "reward top performers and increase our productive hours and number of returned callbacks for the State of Illinois, as well as retain our most committed [CSRs]." Defendant goes on to explain the amount of the bonus [$400 for agents with 150 productive hours], how it can be earned, and that "Deloitte will pay [PCG] based on the mutually approved list of eligible agents…"

78.     However, as explained below, in overtime workweeks that a performance bonus is paid, Defendant and PCG did not include the non-discretionary bonus payments in the calculation of the CSRs' regular hourly rates.

79.     Failing to accurately account and pay for all of the time actually worked by

11

employees is a clear violation of the FLSA's record keeping requirements. *See* 29 U.S.C. § 211(c).

80.     Because CSRs are prohibited from including all hours worked in their time recorded, Defendant's compensation policy and system fails to properly account and compensate them for all time worked, including their overtime hours, each day and each workweek.

81.     Thus, the hours reflected on the CSRs' pay stubs are inaccurate and contrived by Defendant and PCG.

82.     In fact, as outlined below, Defendant and PCG maintain a common plan and policy pursuant to which they fail to pay their CSRs for no less than twelve (12) minutes per day of work performed during pre- and post-shift time and during their lunch periods.

83.     This time could easily be recorded, accounted for and paid, but for Defendant's choice not to credit such time as time worked.

84.     Additionally, Defendant and PCG maintained a policy and practice of only paying CSRs for talk/phone time, rather than for all compensable work performed. In fact, PCG's Managing Director, Tom Numbere, boasted to his managers as follows: "The good news is that we now have people [CSRs] skipping TCP (Purple) [the timeclock] which means that people are getting the message that Finesse [phone system] is that [sic] one that matters for getting paid." He goes on to say that CSRs "should still enter time in TCP [time clock]" because it will be used as a "tool to confirm time also if [the phone system] goes down [sic] we need a way to pay from."

85.     Records show an example of management explaining to a CSR why she was paid for 75.92 hours (phone system time), rather than for the 91 hours that she was clocked in to the timekeeping system. The manager explains that the CSR is "correct in that you have been paid short," but that the discrepancy is because "we pay of the Finesse [phone] system." The manager advises the CSR to "continue to clock in & out on TCP [timekeeping system] as we still use it as

a back up incase [sic] the [phone] system fails…" In another communication, a PCG manager explains to a CSR that "we are paid based off Finesse [phone system] and not Paycom [timeclock]…"

86.     Defendant's policy is that it will only pay agents for time that is considered billable by PCG and Deloitte's client (State of Illinois). In other words, Defendant and PCG only want to pay the CSRs for time that their client pays for, even though the CSRs perform work outside of the billable time. Yet another example of this is Defendant's Technical Support guidance which reminds CSRs that are experiencing technical issues to "add this [technical support] ticket to your daily timecard files to ensure proper billable/non-billable determination."

### A.      Pre-Shift Off-the-Clock Work

87.     In addition to their regularly scheduled shifts, and as mentioned above, Defendant's CSRs perform pre-shift work tasks for which they are uncompensated.

88.     Pursuant to Defendant's policies, training and direction, Defendant's CSRs are required to start up and log into various secure computer programs, software programs and applications in order to perform their jobs.

89.     The pre-shift startup and login process takes substantial time on a daily basis with said time averaging ten (10) to fifteen (15) minutes per day, and the tasks can take longer if CSRs experience technical problems with the computer, software, and/or applications.

90.     Prior to the commencement of each scheduled shift, Plaintiffs, as well as the other CSRs, were required to complete the following tasks or tasks substantially similar to the tasks below:

    a.   Turn on their computers;

    b.   Check internet connection and speed;

13

    c.  Open the Chrome browser;

    d.  Start the Citrix Virtual Desktop ("VDI"), which often took more than one attempt;

    e.  Open Jabber, which works with Finesse to control call state and call management[2];

    f.  After successfully launching the VDI and Jabber, open Finesse (the tool that tells CSRs what state they are in, call duration, and other metrics) and enter a username and password;

    g.  Log into IBIS, the state's tool for managing unemployment claims[3];

    h.  Open a call tracker to record all call summaries throughout the day;

    i.  Outside of the VDI, set up two notepads, one for call totals and one for call summaries;

    j.  Log into Microsoft Teams[4] for pre-shift meetings and instructions; and

    k.  Finally, clock in and begin receiving calls.

91.    The aforementioned tasks are an integral and essential aspect of a CSR's job duties and responsibilities, as CSRs must have all of the above referenced computer programs, systems, and applications up and running on their computers and hard phone in order to be prepared to accept incoming calls.

92.    Yet, Defendant and PCG fail to compensate CSRs for the computer boot up tasks.

93.    As a result, Defendant maintains a common plan and policy pursuant to which it

---

[2] Jabber cannot be opened until the CSR connects to the VDI. Finesse (the phone system) cannot be opened until Jabber is opened and the icon at the bottom right in Jabber is green.
[3] Occasionally, it was necessary to have two separate sessions of IBIS open to manage and research claim issues properly.
[4] Zoom was also occasionally used for meetings.

fails to pay CSRs for no less than ten (10) minutes per day of work performed in connection with the above pre-shift activities.

        **B.**       **Meal-Period Off-the-Clock Work**

94.     Defendant and PCG provides CSRs with one (1) thirty (30) minute unpaid lunch break per shift.

95.     In reality, Defendant and PCG routinely require CSRs to perform work during their unpaid lunch breaks.

96.     Further, time records will establish that Defendant and PCG failed to compensate CSRs for meal periods of less than thirty minutes, and in some cases, less than even twenty minutes.

97.     CSRs' lunch periods were routinely interrupted and/or cut short by work-related activities.

98.     Under federal law, in order to deduct an unpaid meal period from an employee's compensable time, an employee must be completely relieved of his or her employment duties for the entire meal break. 29 C.F.R. § 785.19(a) states:

> ***Bona fide meal periods***. Bona fide meal periods are not work time. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be <u>*completely relieved*</u> from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating. (emphasis added).

99.     Defendant and PCG do not provide CSRs with a bona fide meal period because their policies and procedures require CSRs to return from their lunch early to perform work related activities, including at least part of the boot up process outlined above.

15

100.     CSRs  routinely spend approximately one (1) to two (2) minutes performing bootup related work during their unpaid meal breaks, however, such time is even greater, when CSRs are required to do a complete reboot.

101.     Defendant and PCG's management is aware, or should be aware, that Plaintiffs and other CSRs' perform these tasks off the clock, and could have paid CSRs for this time, but did not.

102.     Defendant made no real effort to compensate Plaintiffs for meal breaks that the time records unquestionably establish were interrupted with work activities.

### C.     Post-Shift Off-the-Clock Work

103.      Pursuant to Defendant's policies, training and direction, Defendant's CSRs are required at the end of each shift to log out of the essential computer software programs and applications utilized during their shifts.

104.     The shutdown and logout process requires another one (1) to two (2) minutes of off the clock work per shift.

105.     Pursuant to Defendant's policies, training and direction, Plaintiffs and the other CSRs are not allowed begin the shutdown and logout process until their scheduled shift ends and they complete their last fielded call.

106.     Defendant did not compensate CSRs for all the time spent shutting down and logging out of their essential work systems.

107.     The unpaid off-the-clock work performed subsequent to each shift by Plaintiffs and all other CSRs directly benefits Defendant, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as CSRs.

### D.     Exemplary Pay-Periods to Illustrate Defendant Only Paid for Phone/Talk Time

108.     29 C.F.R. §785.18 states that "[r]est periods of short duration, running from 5

16

minutes to about 20 minutes, are common in industry .... They *must* be counted as hours worked."[5]

109.     However, any time the CSRs went unavailable in Finesse, for example, to use the rest room, the Defendant and PCG stopped paying them.

110.     As stated above, Defendant and PCG also failed to pay Plaintiffs and other CSRs for all hours worked by only paying them for the time spent available for calls (or on a call) in Defendant's phone system (Finesse).

111.     As a result, Plaintiffs and other CSRs were routinely undercompensated for the hours worked. The table below provides several examples:

| CSR Name | Pay Period | Paycom Hours Worked | Hours Paid | Unpaid Hours |
|----------|-----------|---------------------|-----------|--------------|
| David Carter | 4/16/22 - 4/30/22 | 58.91 | 55.35 | 3.56 |
| David Carter | 5/1/22 - 5/15/22 | 75.22 | 71 | 4.22 |
| David Carter | 7/16/22 - 7/31/22 | 73.46 | 71.66 | 1.8 |

112.     Defendant knew Plaintiffs and the other CSRs were not being paid for all hours worked because the clock-in records were less than what was reported on the CSRs paystubs.

### E.     Exemplary Pay-Period to Illustrate Pre-Shift, Meal-Period and Post-Shift Compensation Deficiencies

113.     An example of specific workweeks where Defendant and PCG failed to pay Plaintiff Carter all overtime due for hours worked in excess of forty (40) hours, as mandated by the FLSA, includes the following:

#### Pay Period of 04/01/2022 to 04/15/2022

•     Plaintiff Carter was paid at a rate of $16.64 per hour for the 76.70 regular hours and

---

[5] In its entirety, 29 C.F.R. §785.18 reads:

Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry. They promote the efficiency of the employee and are customarily paid for as working time. They must be counted as hours worked. Compensable time of rest periods may not be offset against other working time such as compensable waiting time or on-call time.

$24.96 per hour for 0.33 overtime hours Defendant credited him with as having worked.

- With unpaid pre-shift, meal-period, and post-shift time, in a range of twelve (12) to nineteen (19) minutes per shift, at five shifts per week, Plaintiff Carter should have been paid an additional sixty (60) to ninety five (95) minutes at his overtime rate of $24.96 during the overtime workweek.

114.    The off-the-clock hours at issue herein constitute overtime hours worked in many workweeks.

### F.    Defendant Benefitted From the Uncompensated Off-the-Clock Work

115.    At all relevant times, Defendant directed and directly benefitted from the work performed by Plaintiffs and similarly situated employees in connection with the above-described pre-shift, meal-period and post-shift activities performed by CSRs.

116.    At all relevant times, Defendant controlled the work schedules, duties, protocols, applications, assignments and employment conditions of their CSRs.

117.    At all relevant times, CSRs performed the duties Defendant was contractually obligated to supply to the State of Illinois.

118.    At all relevant times, Defendant was able to track the amount of time CSRs spent in connection with the pre-shift, meal-period and post-shift activities.

119.    Defendant failed to do so and failed to compensate CSRs for the off-the-clock work they performed.

120.    At all relevant times, CSRs were non-exempt hourly employees, subject to the requirements of the FLSA.

121.    At all relevant times, Defendant used its attendance, adherence and timekeeping policies against the CSRs in order to pressure them into performing the pre-shift, meal-period and post-shift off-the-clock work.

122.    Defendant expressly trained and instructed CSRs to perform the above-described pre-shift activities *before* the start of their scheduled shifts, to ensure they were prepared to take calls (i.e., were "phone ready") the moment their shifts began.

123.    At all relevant times, Defendant's policies and practices deprived CSRs of wages owed for the pre-shift, meal-period and post-shift activities they performed.

124.    Because Defendant's CSRs typically worked forty (40) hours or more in a workweek, Defendant' policies and practices also deprived them of overtime pay in many workweeks.

125.    Defendant knew or should have known that the time spent by CSRs in connection with the pre-shift, meal-period and post-shift activities was compensable under the law.

126.    In light of the explicit DOL guidance cited above, there is no conceivable way for Defendant to establish that they acted in good faith.

127.    Despite knowing CSRs performed work before and after their scheduled shifts and during their unpaid meal periods, Defendant failed to make any effort to stop or disallow the off-the-clock work and instead suffered and permitted it to happen.

128.    Unpaid wages related to the off-the-clock work described herein are owed to CSRs at the FLSA mandated overtime premium of one and one-half their regular hourly rate because CSRs regularly worked in excess of forty (40) hours in a workweek.

### G. Defendant Failed to Include Non-Discretionary Bonuses in the Calculation of the CSRs' Overtime Rates

129.    Under the FLSA, the regular rate is the "keystone" to calculating the overtime rate. *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945).

130.    It is "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." 29 C.F.R. §778.108.

19

131.    No matter how an employee is paid—whether by the hour, by the piece, on a commission, or on a salary—the employee's compensation must be converted to an equivalent hourly rate from which the overtime rate can be calculated. 29 C.F.R. §778.109.

132.    "The regular hourly rate of pay is determined by dividing the employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by the employee in that workweek for which such compensation was paid." *Id.*

133.    Defendant and PCG's compensation scheme, which included an hourly rate, plus incentive pay, did not fall within any of the statutory exclusions from the regular rate as provided in 29 U.S.C. §§ 207(e)(1)-(8).

134.    Defendant and PCG's compensation scheme failed to incorporate all bonuses received in the regular rate of pay, for purposes of calculating overtime, in weeks in which Plaintiffs, and those similarly situated, worked overtime hours.

135.    Because Defendant and PCG's compensation scheme failed to incorporate all the bonuses received in the regular rate of pay, Defendant failed to properly compensate Plaintiffs and its other CSRs under the FLSA.

## JOINT EMPLOYMENT ALLEGATIONS

136.    Under the FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

137.    The definition of "employer" under the FLSA is not limited to the common law concept of "employer," and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes. *Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748, 754 (9th Cir. 1979).

20

138.    Congress defined "employee" as "any individual employed by an employer," 29

U.S.C. § 203(e)(1), describing this language as "the broadest definition that has ever been included

in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (*quoting* 81 Cong.

Rec. 7657 (1937) (statement of Sen. Hugo Black)); *Tony & Susan Alamo Found. v. Sec'y of Labor*,

471 U.S. 290, 300 n.21 (1985) (same).

139.    The determination of whether an employer-employee relationship exists does not

depend on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford*

*Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). The touchstone is "economic reality."

*Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961).

140.    Two or more employers may jointly employ someone for purposes of the FLSA.

*Falk v. Brennan*, 414 U.S. 190, 195 (1973).

141.    Two or more employers may also employ someone for purposes of the IMWL and

IWPCA. *See*, *Zampos v. W & E Commc'ns, Inc.*, 970 F. Supp. 2d 794, 806 (N.D. Ill. 2013) (holding

joint employment test under the FLSA and IMWL is similar); *Johnson v. Logistics*, No. 16-CV-

06776, 2018 WL 1519157, at *11 (N.D. Ill. Mar. 28, 2018) (holding Plaintiffs need not establish

a separate agreement to pay wages existed with each joint employer under the IWPCA).

142.    All joint employers are individually responsible for compliance with the FLSA. 29

C.F.R. § 791.2(a) (1981).

143.    Regulations issued by the Department of Labor give the following examples of joint

employment situations:

> (2) Where one employer is acting directly or indirectly in the interest of the other
> employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the
> employment of a particular employee and may be deemed to share control of the
> employee, directly or indirectly, by reason of the fact that one employer controls,

is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b) (footnotes omitted)

144.    The ultimate question of whether a party is an "employer" is a legal issue. *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1983). The ultimate determination must be based "upon the circumstances of the whole activity." *Id*. at 1470 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947).

145.    "[T]he test for determining whether a joint-employment relationship exists under the IWPCA is not entirely different than the FLSA and IMWL." *Zampos v. W & E Commc'ns, Inc.*, 970 F. Supp. 2d 794, 806 (N.D. Ill. 2013).

146.    The IWPCA likewise recognizes claims brought under the joint-employment theory and Plaintiffs need not establish a separate agreement existed with each joint employer because the doctrine is one of joint liability for a failure to pay wages. *Johnson v. Logistics*, No. 16-CV-06776, 2018 WL 1519157, at *11 (N.D. Ill. Mar. 28, 2018).

147.    At all relevant times, Defendant and PCG both directly or indirectly controlled the rate and method of payment for the employees (including remote CSRs); controlled and dictated their schedule and job duties; and otherwise, exercised control, input, and responsibility for the work hours, compensation and pay policies at issue in this case.

148.    Defendant meets the test for employer/joint employer.

149.    Defendant and PCG entered into a contract whereby they established a call center operation to process Illinois Department of Employment Security ("IDES") unemployment claims during the COVID-19 pandemic ("IDES project").

150.    According to PCG, "The partnership with Deloitte fostered collaboration, knowledge sharing, and created a pipeline of diverse talent that set us apart."

151. All CSRs employed on the IDES project we required to acknowledge receipt of the contract between PCG, Deloitte and IDES, and "agree to abide by all terms and conditions of the Contract" and also agree to the following:

   a. "I have been instructed by Deloitte on the permissible use(s) of the Confidential Information and will not use the Confidential Information for any other purpose;"

   b. "I have received instruction from Deloitte on the proper way to store, handle, and protect the confidentiality of the Confidential Information and shall take all necessary steps to reduce the risk of unauthorized disclosure or use;"

   c. "I understand that I may not share the Confidential Information with any other entity or person, including but not limited to other employees, agents, or contractors of Deloitte who are not authorized to access the Confidential Information";

   d. "I understand that all equipment, software, and internet/telecommunication services shall be secure and provided by or approved by Deloitte"

152. The contract between PCG and Deloitte contains the following agreements with respect to the hiring, training, daily supervision, and discipline of CSRs:

   a. "Before [PCG's] assignment of any person [CSR] to perform Services, Deloitte Consulting will have the opportunity to review such person's qualifications, which may include a review of such person's curricula vitae and an in-person interview. **Deloitte Consulting, in its sole discretion, may approve or disapprove the assignment of any person proposed by Subcontractor**."

   b. "[PCG"] and Deloitte Consulting agree that the personnel of [PCG] listed in a Work Order will begin performance of the Services as designated in the Work Order or if not so designated, promptly upon Deloitte Consulting's request. Deloitte Consulting may, in its **sole discretion** and at any time during the term of a Work Order, require [PCG] to remove any person from performing Services."

   c. "If Deloitte Consulting requests any additional personnel to perform Services under a Work Order, [PCG] will provide Deloitte Consulting with suitable person(s) at the same rates for the same levels of experience as those persons already performing such Services."

   d. PCG must perform background checks on prospective CSRs using the

requirements set forth by Deloitte. If any "negative findings" are identified in a CSRs background check "[PCG] shall notify Deloitte Consulting and shall not assign such individual to perform the Services without Deloitte Consulting's **prior written consent** which will not be unreasonably withheld."

e.      "[PCG] shall ensure that all individuals whom it sources to perform the services under this Agreement have completed all confidentiality and **other training required by Deloitte** Consulting within five business days of their commencement of performance of services under the applicable Work Order. Deloitte Consulting shall apprise [PCG] **of the training required** reasonably in advance of the scheduled date upon which such individual is to commence performance of services."

f.      "All Services by [PCG] will be performed at locations **approved in advance** in writing by Deloitte Consulting in the applicable Work Order."

**g.**      "[PCG] will be required to ensure that its personnel and subcontractors follow reasonable **work rules established by the Client and/or Deloitte Consulting.**

h.      "Any equipment (including, without limitation, laptop computers) provided to [PCG] by Deloitte Consulting for use in performing the Services shall immediately be returned in the same condition in which it was first received, reasonable wear and tear excepted,"

i.      "In addition, all Services to be performed by Subcontractor will be done **in a manner acceptable** to Deloitte Consulting."

j.      Deloitte set the "core working hours" as "Monday through Friday, 7:30 AM to 7 PM CST"

k.      "All [PCG] personnel providing services herein, must complete onboarding requirements including but not limited to security and criminal background checks. confidentiality agreements , and training variety of Deloitte and Client policies including managing confidential information . All Call Center Agents ' computers will have an active firewall; an installed, running, and up-to-date antivirus software package."

l.      "All agents [CSRs] and staff performing Services shall be considered Key Personnel."

m.      PCG was required to provide "monthly status report comprising a detailed statement of agent Staffed Hours and description of summary of specific services worked agent as mutually agreed upon by Deloitte and [PCG]" as well as:

24

(a) "workforce management analysis to include call arrival reports, daily half hour adherence reports , and over/under reports as related to staffing on a 30-minute interval, and other metrics as mutually agreed. If Client system is not capable of providing the applicable report, Subcontractor may use Subcontractor's system to provide such report."

(b) "Quality assurance scorecards through the live monitoring call center agents based on established standards."

(c) "Call arrival reports that reflect daily half hour intervals and agents scheduled"

(d) "An overview of calls handled, Scheduled Hours , and other mutually agreed metrics, as reasonably requested by Deloitte Consulting"

(e) Summary information for each agent for each Staffed Hour worked (minus lunch breaks, scheduled 15-min breaks, etc.)"

(f) "As part of agent training , Deloitte Consulting will provide job aids and training on Illinois unemployment compensation. All call center agents must complete this training."

n.     Deloitte requires the CSRs to: "Answer[ ] and route[] appropriately call types agreed between the parties to provide information and assistance relating to issues and inquiries. Act[] as the customers point of contact in resolving any issues or requests that the customer presents."

o.     PCG must provide computer equipment that meets Deloitte's requirements with respect to firewalls, software,  and security.

p.     Each CSR must acknowledge in writing that he or she "will be performing services for [Deloitte]" and that with "respect to work product prepared by [CSR] during the course of your services,…..Deloitte Consulting shall own all work product produced by you hereunder, including, without limitation, deliverables, computer programs (source code and object code ), programming aids and tools, documentation, reports, data, designs, concepts, know-how , and other information, whether copyrightable or patentable or not (collectively, " Work Product") created exclusively for the project."

153.   Finally, Deloitte directs that a "staffed hour" by a CSR includes only "time spent talking with clients, after call work, QA, supervisor time, workforce management, technology

integration, lime spent logged into the phone system to handle customer calls, and all other functions that call center personnel will perform hereunder. Staffed Hours will not include required breaks or lunches, but will include training and briefing activities, and is the time entered by agents in their companies' internal lime tracking system consistent with the Client contract."

154.    Moreover, in the agreement between IDES and Deloitte, Deloitte retains responsibility for training and educating CSRs with respect to protected health information, social security numbers and other sensitive data.

155.    For example, Deloitte agreed that "only its officers and employees… who have a need to access disclosed SSNs for the purpose(s) and use(s) identified in the Agreement will have access to disclosed SSNs.

156.    In the same agreement, Deloitte "also affirms that it is responsible for enforcing this restriction of access to disclosed SSNs, and that all of the officers and employees of [Deloitte] who will have access to disclosed SSNs have been trained to protect the confidentiality of SSNs in accord with this policy statement. Training shall include instructions on proper handling of disclosed SSNs from receipt through disposal (see Paragraph 7)."

157.    Deloitte also provides all substantive training to CSRs. One example involves the guidance to a CSRs on spotting "fraud scenarios." That guidance provides the steps for an agent to take in resolving a suspected fraud scenario. CSRs are directed to "follow up with Deloitte Team the next day to ensure the issue was escalated."

158.    Supervisors are directed to notify the "Deloitte Training Team" using the Deloitte fraud issues template.

159.    Another example is a 9-lesson power point prepared by Deloitte to "prepare agents for handling calls concerning Post Pandemic Extension programs…" The powerpoint covers topics

such as eligibility, and is designed to "provide information so agents can discuss programs with claimants." [Id]. This training document also directs CSRs on how to "deliver unwanted news without escalating tensions."

160.    In fact, Under Deloitte's contract with the State of Illinois for the IDES project, they were "required to establish a quality assurance plan to monitor and track each agent's performance of work."[6]

161.    Additionally, under its contract with the State of Illinois, Deloitte was required to submit detailed reports to the State regarding the CSRs "describing the work performed, number of calls, number of calls transferred, average talk time, average response time, average handle time, and problems encountered and their resolutions."

162.    PCG and Deloitte also collaborated to provide call center services (using CSRs) in connection with the Illinois Department of Public Health ("IDPH project"): "PCG collaborated with Deloitte to focus on core responsibilities of conducting interviews, providing guidance, and collecting critical information while efficiently managing the communication aspects of contact tracing." PCG further describes the joint operation as follows:

163.    The arrangement for the IDPH project is nearly identical in all respects when compared to the IDES project.

164.    Deloitte and PCG jointly exercised control over the CSRs on the IDPH project.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

165.    Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) of the FLSA on their own behalf and on behalf of:

> ***All current and former CSRs who worked for Defendant and PCG at any time during the three years preceding the filing of this Complaint up***

---

[6] *See*, 23-IDES-Unemployment-Ins-Prgms-Perf-Full.pdf (illinois.gov) at page 41 (last visited on 7/9/2024). A hard copy of this 156-page audit is available upon the Court's request.

*through and including judgment.*

(hereinafter referred to as the "FLSA Collective"). Plaintiffs reserve the right to amend this definition if necessary.

166.    Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and other similarly situated CSRs.

167.    Excluded from the proposed FLSA Collective are Defendant's executives and administrative and professional employees, including computer professionals and outside salespersons.

168.    Consistent with Defendant's policy and pattern or practice, Plaintiffs and the members of the FLSA Collective were not paid premium overtime compensation when they worked beyond forty (40) hours in a workweek.

169.    Defendant assigned and/or was aware of all of the work that Plaintiffs and the members of the FLSA Collective performed.

170.    As part of its regular business practices, Defendant intentionally, willfully and repeatedly engaged in a pattern, practice and/or policy of violating the FLSA with respect to Plaintiffs and the members of the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

      a.    Willfully failing to pay their employees, including Plaintiffs and the members of the FLSA Collective, premium overtime wages for all hours worked in excess of forty (40) hours per workweek; and

      b.    Willfully failing to record all of the time that their employees, including Plaintiffs and the members of the FLSA Collective, worked for the benefit of Defendant.

171.    Defendant is aware or should have been aware that federal law requires it to pay Plaintiffs and the members of the FLSA Collective overtime premiums for hours worked in excess

of forty (40) per workweek.

172.    Defendant's unlawful conduct has been widespread, repeated and consistent.

173.    A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b).

174.    The employees on behalf of whom Plaintiffs bring this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

175.    The employment relationships between Defendant and every proposed FLSA Collective member are the same and differ only by name, location and rate of pay.

176.    The key issues – the amount of uncompensated pre-shift start-up/log-in time, unpaid meal period time, and the amount of post-shift shut down/log out time owed to each employee – do not vary substantially among the proposed FLSA Collective members.

177.    Many similarly situated current and former CSRs have been underpaid in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

178.    Court-supervised notice of this lawsuit was sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

179.    Those similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

180.    Plaintiffs estimate that the proposed FLSA Collective, including both current and former employees over the relevant period, will include hundreds, if not thousands, of workers.

181.    The precise number of FLSA Collective members should be readily available from a review of Defendant or PCG's personnel and payroll records.

## **RULE 23 ILLINOIS CLASS ACTION ALLEGATIONS**

182.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on their own behalf and on behalf of:

> *All current and former CSRs who worked for Defendant and PCG in Illinois at any time during the applicable statutory period*.

(hereinafter referred to as the "Rule 23 Illinois Class"). Plaintiffs reserve the right to amend the putative class definition if necessary.

183.    The members of the Rule 23 Illinois Class are so numerous that joinder of all Rule 23 Illinois Class members in this case would be impractical.

184.    Plaintiffs reasonably estimate that there are hundreds of Rule 23 Illinois Class members. Rule 23 Illinois Class members should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

185.    There is a well-defined community of interest among Rule 23 Illinois Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Illinois Class.

186.     These common legal and factual questions include, but are not limited to, the following:

> a.      Whether the pre-, mid-, and post-shift time Rule 23 Illinois Class members spend on start-up/log-in activities, shut-down activities, and mid-shift call logging activities off the clock each shift is compensable time;
>
> b.      Whether Defendant breached its agreement with the Plaintiffs and the Rule 23 Illinois Class to pay for all hours worked at the agreed upon rate;
>
> c.      Whether the Rule 23 Illinois Class members are owed wages for time spent performing pre-, mid-, and post-shift activities discussed herein, and if so,

the appropriate amount thereof; and

d.   Whether, if it is determined that the formal agreement does not exist, Defendant was unjustly enriched by failing to pay Plaintiffs and the Rule 23 Illinois Class members for all hours worked.

187.   Plaintiffs' claims are typical of those of the Rule 23 Illinois Class in that they and all other Rule 23 Illinois Class members suffered damages as a direct and proximate result of the Defendant's common and systemic payroll policies and practices.

188.   Plaintiffs' claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Illinois Class members' claims and their legal theories are based on the same legal theories as all other Rule 23 Illinois Class members.

189.   Plaintiffs will fully and adequately protect the interests of the Rule 23 Illinois Class and they have retained counsel who are qualified and experienced in the prosecution of Illinois wage and hour class actions.

190.   Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Illinois Class.

191.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because, *inter alia*, it is economically infeasible for Rule 23 Illinois Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer.

192.   Prosecution of this case as a Rule 23 Class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

193.   This case will be manageable as a Rule 23 Class action. Plaintiffs and their counsel know of no unusual difficulties in this case and Defendant and its corporate/government clients all have advanced, networked computer and payroll systems that will allow the class, wage, and

damages issues in this case to be resolved with relative ease.

194.     Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393; 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

195.     Because Defendant acted and refused to act on grounds that apply generally to the Rule 23 Illinois Class and declaratory relief is appropriate in this case with respect to the Rule 23 Illinois Class as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

**COUNT I**
**(29 U.S.C. § 216(b) Collective Action)**
**VIOLATION OF FLSA, 29 U.S.C. § 201, *et seq*.**
**FAILURE TO PAY OVERTIME WAGES**

196.     Plaintiffs re-allege and incorporate all previous paragraphs herein.

197.     At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

198.     At all times relevant to this action, Plaintiffs and the FLSA Collective were "employees" of Defendant within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

199.     Plaintiffs and the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

200.     Plaintiffs and the FLSA Collective either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

201.     At all times relevant to this action, Defendant "suffered or permitted" Plaintiffs and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

202.    At all times relevant to this action, Defendant required Plaintiffs and the FLSA Collective to perform no less than twelve (12) to nineteen (19) minutes of off-the-clock work per shift, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

203.    In workweeks where Plaintiffs and other FLSA Collective members worked forty (40) hours or more, the uncompensated off-the-clock work time, and all other overtime, should have been paid at the federally mandated rate of 1.5 times each employee's regularly hourly wage, including shift differentials and nondiscretionary incentive pay where applicable. 29 U.S.C. § 207.

204.    Defendant's violations of the FLSA were knowing and willful.

205.    Defendant knew or could have determined how long it takes its CSRs to perform their off-the-clock work.

206.    Further, Defendant could have easily accounted for and properly compensated Plaintiffs and the FLSA Collective for these work activities, but did not.

207.    The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

**COUNT II**
**(Rule 23 Illinois Class Action)**
**Illinois Minimum Wage Law, §§ 820 ILCS 105/1, *et seq.*;**
**Illinois Wage Payment and Collection Act, §§ ILCS 115/1, *et seq.*;**

208.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

209.    The promises made by Defendant and PCG jointly to compensate CSRs on an *hourly rate for all hours worked* (the agreement) is binding upon Defendant for purposes of the Illinois Minimum Wage Law (IMWL) and Illinois Wage Payment and Collection Act (IWPCA) discussed herein.

210.    Indeed, Plaintiffs and every other Illinois Class Member had an agreement with Defendant and PCG that they would be paid based at their agreed upon hourly rate (and overtime rate when applicable) for *all* hours worked. Defendant and/or PCG promised all CSRs they would be paid an hourly wage for *all* hours worked.

211.    An offer letter, setting forth the rate of pay in exchange for work, which is signed by both parties, is sufficient to establish an agreement for purposes of the IWPCA. *See e.g.*, *Osorio v. Tile Shop, LLC*, No. 15 C 15, 2015 U.S. Dist. LEXIS 159748, at *6 (N.D. Ill. Nov. 27, 2015); *Brown v Ill Bell Tel Co*, ___F Supp 3d___; 2016 U.S. Dist. LEXIS 6106, at *16-17 (ND Ill, Jan. 19, 2016). *See also*, Exhibit 3.

212.    An agreement is further evidenced by the fact Defendant and PCG required CSRs to track their time and "clock-in," but then did not pay them for the time spent clocked in.

213.    Plaintiffs and the putative class members never consented to be paid for only talk time, and rather, expected to be paid pursuant to the Parties agreement to pay them at a specified hourly wage for all work performed.

214.    As discussed herein, Defendant and PCG failed to pay Plaintiffs and the Rule 23 Illinois Class for all wages (regular and overtime) owed.

215.    Through the implementation of their written timekeeping and attendance policies, as well as the verbal representations made by Defendant or PCG's management to CSRs regarding their attendance, scheduling, and hourly compensation, Defendant promised Plaintiffs and the Rule 23 Illinois Class payment at their regular hourly rate for *all* hours worked in exchange for the performance of the CSRs' job duties.

216.    Plaintiffs accepted that offer, performed the duties of a CSR for Defendant, but Defendant breached their agreement with Plaintiffs and the Rule 23 Illinois class by failing to pay

them for *all* hours worked as promised.

217.     At all times relevant to the action, Defendant was an employer covered by the mandates of the IMWL, and Plaintiffs and the Rule 23 Illinois Class are employees entitled to the IMWL's protections.

218.     The IMWL, §§ 820 ILCS 105/1, et. seq. requires employers to pay their employees minimum wages and time-and-a-half their regular rate of pay of hours worked in excess of forty (40) per week. *See* § 820 ILCS 105/4; 820 ILCS 105/4a.

219.     820 ILCS 105/12(a) provides that an employee who is not paid in accordance with the Illinois Minimum Wage Law "the employee may recover in a civil action treble the amount of any such underpayments together with costs and such reasonable attorney fees as may be allowed by the Court, and damages of 5% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid."

220.     The IWPCA "applies to all employers and employees in [Illinois], but excepting employees of the State or Federal governments." Plaintiffs and the Rule 23 Illinois class were not employees of the State or Federal government, therefore, they are entitled to the protections of the IWPCA.

221.     Under 820 ILSC 115/4, "[a]ll wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned."

222.     Under 820 ILSC 115/5, "every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee."

223.     820 ILCS 115/9 prohibits "deductions by employers from wages or final

compensation." Accordingly, in workweeks that Defendant unilaterally altered time records to exclude the pre-, mid-, and post-shift activities discussed herein, Defendant violated 115/9 of the IWPCA.

224.    Additionally, 820 ILCS 115/14(a) provides that "an employee aggrieved by an employer's violation of the Illinois Wage Payment and Collection Act "shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees."

225.    Defendant violated the IMWL and the IWPCA by regularly and repeatedly failing to compensate Plaintiffs and the Rule 23 Illinois Class for the time spent on the work activities described in this Complaint.

226.    As a result, Plaintiffs and the Rule 23 Illinois Class have and will continue to suffer loss of income and other damages.  Accordingly, Plaintiffs and the Rule 23 Illinois Class are entitled to recover unpaid wages owed, liquidated damages, costs and attorneys' fees, and other appropriate relief under the IMWL at an amount to be proven at trial.

## COUNT III
## UNJUST ENRICHMENT

227.    Plaintiffs re-allege and incorporate all previous paragraphs herein except for any paragraph, sentence, or averment that alleges a contract or agreement to pay wages existed between the Plaintiffs and Defendant or PCG, or the Rule 23 Illinois Class members and Defendant or PCG, including, but not limited to, paragraphs 49-51, 186, 209-226.

228.    This Count is pled in the alternative to Count II, supra, pursuant to Fed. R. Civ. P. 8(d)(2)-(3) in the event it is determined that no employment contract or agreement existed between

Plaintiffs and Defendant as alleged in Count II. In other words, to the extent that this Court ultimately finds that no contract provision or agreement expressly governs the claims arising from the allegations in this Complaint, Defendant is nonetheless liable for unjustly enriching itself at Plaintiffs' expense.

229.    As more fully described herein, the expectation of the Plaintiffs and every other Rule 23 Illinois Class member to be paid for the unpaid wages alleged in this Complaint was reasonable.

230.    Additionally, whether the promises of payment to the CSRs were made directly by Defendant or indirectly by PCG, in either case Defendant was unjustly enriched.

231.    At all times relevant to this action, Defendant and/or PCG promised Plaintiffs and every other Rule 23 Illinois Class member a pre-established regular hourly rate in consideration of the work duties Plaintiffs and the Rule 23 Illinois Class members performed for the benefit of Defendant.

232.    At all times relevant to this action, Defendant and/or PCG promised Plaintiffs and every other Rule 23 Illinois Class member a pre-established regular hourly rate in consideration of the work duties Plaintiffs and the Rule 23 Illinois Class members performed for the benefit of Defendant.

233.    Plaintiffs and every other Rule 23 Illinois Class member relied upon Defendant and/or PCG's promise for the pre-established regular hourly rate and performed by doing their jobs and carrying out their required work duties.

234.    By not paying Plaintiffs and every other Rule 23 Illinois Class member the agreed upon hourly wage for the off-the-clock work they performed for Defendant each shift, and for the on-the-clock work which Defendant nonetheless failed to compensate Plaintiffs and the Rule 23

Illinois Class for, Defendant was unjustly enriched.

235.    Plaintiffs and the Rule 23 Illinois Class members performed off-the-clock work tasks at the request of (either directly or indirectly through PCG) and without objection by Defendant. Recall, Defendant provided much of the job training to the CSRs.

236.    Similarly, Plaintiffs and the Rule 23 Illinois Class members performed the on-the-clock work tasks that they were not compensated for at the request of and without objection by Defendant.

237.    Defendant received and accepted the above-referenced off-the-clock and uncompensated on-the-clock work services from Plaintiffs and every other Rule 23 Illinois Class member and enjoyed the benefits derived therefrom.

238.    Plaintiffs and the Rule 23 Illinois Class members conferred a substantial benefit upon Defendant when they performed the off-the-clock work tasks described herein.

239.    Defendant has retained the benefit of the bargain with Plaintiff.

240.    Upon information and belief, Defendant was able to underbid other competitors for contracts on which Plaintiffs worked, because its bid failed to include compensation for all compensable hours worked.

241.    Further, upon information and belief, Defendant used the monies owed to Plaintiffs and every other Rule 23 Illinois Class member to finance its various business ventures or pay its equity owners.

242.    Defendant has been unjustly enriched by the retention of monies received pursuant to the services Plaintiffs and the Rule 23 Illinois Class performed for Defendant's benefit, without having compensated Plaintiffs and the Rule 23 Illinois Class for the same.

243.    Plaintiffs and the Rule 23 Illinois Class suffered detriment due to Defendant's

failure to compensate them for the off-the-clock work described herein, in that Plaintiffs and the Rule 23 Illinois Class were deprived of the ability to utilize that time, effort and their resources in a profitable manner.

244.     As a direct and proximate result of Defendant's actions, and only to the extent there is no valid contract or legally binding agreement, Defendant was unjustly enriched and Plaintiffs and every other Rule 23 Illinois Class member suffered damages, including but not limited to, loss of wages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf, on behalf of the putative FLSA Collective, and on behalf of the Rule 23 Illinois Class request judgment as follows:

a.    Declaring Defendant was a joint employer of Plaintiffs and the putative class and collective members;

b.    Certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth herein (Count I);

c.    Certifying this action as a class action (for the Rule 23 Illinois Class) pursuant to Rule 23(b)(2) and (b)(3) with respect to Plaintiffs' state law claims under the IMWL and IWPCA (Count II);

d.    Certifying this action as a class action (for the Rule 23 Illinois Class) pursuant to Rule 23(b)(2) and (b)(3) with respect to Plaintiffs' state law unjust enrichment claims (Count III);

e.    Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names and addresses of all collective action Class members and the Rule 23 Illinois Class members, and permitting Plaintiffs to send notice of this action to all those similarly situated individuals, including the publishing of notice in a manner that is reasonably calculated to apprise the Class members of their rights by law to join and participate in this lawsuit;

f.    Designating Plaintiffs as the representative of the FLSA collective action and the Rule 23 Illinois Class, and undersigned counsel as Class counsel for the same;

g.    Declaring Defendant violated the FLSA and the DOL's attendant regulations as cited herein;

h. Declaring Defendant's violation of the FLSA was willful;

i. Declaring Defendant violated the IMWL and the IWPCA as cited herein;

j. Declaring Defendant's violation of the IMWL and IWPCA was willful;

k. Granting judgment in favor of Plaintiffs and against Defendant and awarding Plaintiffs and the collective action Class and the Rule 23 Illinois Class the full amount of damages and liquidated damages available by law;

l. Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by statute;

m. Awarding treble damages and penalty interest as provided by the IMWL and IWPCA;

n. Awarding other pre- and post-judgment interest to Plaintiffs on these damages; and

o. Awarding such other and further relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand for a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided with respect to the above-entitled cause.

Dated: August 15, 2024          Respectfully Submitted,

**ASH LAW, PLLC**

Charles R. Ash, IV (P73877) (*Admitted*)
402 West Liberty Street.
Ann Arbor, MI 48103-4388
Phone: (734) 234-5583
cash@nationalwagelaw.com

**MORGAN & MORGAN, P.A.**
Andrew R. Frisch (FBN 027777) (*Admitted*)
55 E Monroe Street, Suite 3800
Chicago, IL 60603
Phone: (954) WORKERS
AFrisch@forthepeople.com

**HOOPER HATHAWAY, P.C.**

*s/ Oscar A. Rodriguez*
Oscar A. Rodriguez (P73413) (*Admitted*)
126 South Main Street
Ann Arbor, MI 48104-1903
Phone: (734) 662-4426
orod@hooperhathaway.com

*Counsel for Plaintiffs and the
Putative Collective/Class Members*